UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>(1) THE REAL PROPERTY LOCATED AT 1100 UPTOWN PARK BLVD., UNIT 233, HOUSTON, TEXAS 77056;<br><br>(2) THE REAL PROPERTY LOCATED AT 18101 COLLINS AVENUE, UNIT 5209, MIAMI, FLORIDA 33160;<br><br>(3) APPROXIMATELY $3,142.19 IN U.S. CURRENCY SEIZED FROM STELLAR BANK ACCOUNT x3876;<br><br>(4) APPROXIMATELY $3,544,819.41 IN U.S. CURRENCY SEIZED FROM STELLAR BANK ACCOUNT x4438;<br><br>(5) APPROXIMATELY $412,214.39 IN U.S. CURRENCY SEIZED FROM THE NORTHERN TRUST COMPANY ACCOUNT x4370; AND<br><br>(6) APPROXIMATELY $79,433.14 IN U.S. CURRENCY SEIZED FROM STELLAR BANK ACCOUNT x6763,<br><br>    Defendants. | CIVIL ACTION NO. ___ |

**UNITED STATES' VERIFIED COMPLAINT FOR CIVIL FORFEITURE
*IN REM* AND NOTICE TO POTENTIAL CLAIMANTS**

The United States of America, Plaintiff, files this action for forfeiture *in rem* pursuant to

Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture

1

Actions and the Federal Rules of Civil Procedure against the below-listed properties (collectively the "Defendant Properties"). All dates, amounts, and locations described in this action are approximations. The verified complaint names the parties to the action in accordance with Federal Rules of Civil Procedure 10(a) and 17(a)(1) and elsewhere uses pseudonyms for various persons and entities. The United States alleges on information and belief as provided below.

## NATURE OF THE ACTION

1. This is a civil action *in rem* brought pursuant to 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 [of Title 18], or any property traceable to such property." Under 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful for a person to conduct or attempt to conduct a financial transaction with proceeds of a specified unlawful activity knowing that the transaction is designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. Under 18 U.S.C. § 1957, it is unlawful for a person to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and that is derived from specified unlawful activity.

2. This civil action is also brought pursuant to 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C.] section 1956(c)(7) of this title), or a conspiracy to commit such offense."

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1355, 1391(b) and 1395.

## THE DEFENDANT PROPERTIES

4. The Defendant Properties are the following real properties and U.S. currency funds previously seized by the United States pursuant to warrants issued by the Court.

### A. Real properties

| Name of real property | Address of real property | Owner of real property |
|---|---|---|
| "Houston Unit" | 1100 Uptown Park Blvd., Unit 233, Houston, Texas 77056 | HOPEN S.A. |
| "Miami Unit" | 18101 Collins Avenue, Unit 5209, Miami, Florida 33160 | HOPEN S.A. |

### B. Funds

| Name of bank account | Financial institution | Account number | Account holder | Amount of seized funds |
|---|---|---|---|---|
| "Defendant Account 1" | Stellar Bank (Houston, Texas) | x4438 | HOPEN LIMITADA | $3,544,819.41 |
| "Defendant Account 2" | Stellar Bank (Houston, Texas) | x3876 | HOPEN LIMITADA | $3,142.19 |
| "Defendant Account 3" | The Northern Trust Company (Chicago, Illinois) | x5546 | Estate of RANDALL NELSON | $412,214.39 |
| "Defendant Account 4" | Stellar Bank (Houston, Texas) | x6763 | FERNANDO TRESGALLO | $79,433.14 |

## FACUAL BASIS FOR FORFEITURE

### A. Overview

5. The offense conduct involves violations of 18 U.S.C. § 1343, (wire fraud), 18 U.S.C. § 1349 (wire fraud conspiracy), 18 U.S.C. §§ 1956(a)(1)(B)(i), 1957 (money laundering)

and 18 U.S.C. § 1956(h) (money laundering conspiracy) in the Southern District of Texas and elsewhere. The offense conduct occurred in or about and between 2009 and December 2022 and involves RANDALL NELSON, H.V., PEDRO ASCORBE, G.H., H.M., FERNANDO TRESGALLO, and their associates.

6. At various times in or about and between 2009 and 2022, the conspirators conspired to defraud A.C., a construction company headquartered in Madrid, Spain, of money and property. The purpose of the wire fraud conspiracy was personal financial gain. The conspirators sought to acquire money from A.C. and undertook certain acts to do so. For example, certain conspirators submitted false invoices to other coconspirators who worked at A.C. and its affiliates to obtain A.C. funds. The wire fraud conspiracy generated proceeds used in furtherance of a money laundering conspiracy, the purpose of which was personal financial gain. As part of the wire fraud and money laundering conspiracies, NELSON, H.V., G.H., and others helped establish multiple foreign and U.S.-based bank accounts in the names of shell companies under their control. NELSON, H.V., G.H., and others used these accounts redirect SUA proceeds from A.C. subsidiaries through foreign bank accounts and ultimately to U.S.-based bank accounts that NELSON helped establish on behalf of current A.C. executives that were part of the scheme.

7. Many domestic accounts that were established for A.C. executives, including ASCORBE and TRESGALLO, were initially formed at Security State Bank, in which NELSON had a financial interest. In July 2015, Houston-based Post Oak Bank, N.A. ("Post Oak Bank") bought Security State Bank. NELSON retained a financial interest in Post Oak Bank.

8. On many occasions, NELSON and G.H. received money from one of A.C.'s subsidiaries (located in the US or name other country), immediately transferred the money to other bank accounts in the names of businesses under their control, and then sent funds to a U.S.-based bank account that NELSON helped establish for current A.C. officials and fellow coconspirators.

9. NELSON portrayed himself as an international oil and gas consultant. He was affiliated with numerous financial accounts opened in the names of various corporate entities. In his online biography NELSON wrote he was "involved in some of the most important engineering and construction projects in Mexico …"

10. In April 2018, Allegiance Bancshares, Inc. ("Allegiance Bank") contracted to merge Post Oak Bank with Allegiance Bank. In February 2023, Allegiance Bank became Stellar Bank. NELSON used financial accounts that he established and controlled at these financial institutions to execute the wire fraud conspiracy.

11. ASCORBE was the chairman and chief executive officer of D.O., a subsidiary of A.C. that serviced the oil and gas industry globally. ASCORBE and NELSON previously worked together at A.C.

12. TRESGALLO was the director general of A.V., a subsidiary of A.C. TRESGALLO later became the director general of M.A., a subsidiary of A.C. A.V. provided construction and infrastructure services to the energy sector.

13. H.V. was an accountant. From 2005 through 2009, he assisted NELSON with bookkeeping duties for R.A., a shell company that did not have legitimate business operations. Rather, R.A.'s purpose was to receive money in the U.S. from A.C. for the benefit of NELSON.

14. NELSON had a consulting contract with D.O. NELSON did not have any other consulting contracts. NELSON helped D.O. to win contracts for large offshore oil platforms. These contracts often exceeded $100 million. NELSON received a success fee based on the contracts that NELSON won for D.O. That fee was usually a percentage of the contract NELSON helped win. NELSON instructed H.V. to make payments to ASCORBE from R.A.'s bank accounts. ASCORBE was D.O.'s top executive. NELSON did not tell H.V. the reason that NELSON was paying ASCORBE. NELSON knew the payments to ASCORBE were to advance the wire fraud conspiracy. ASCORBE's bank account was in the United States. H.V. had no knowledge of ASCORBE ever doing work for NELSON or R.A. or receiving loans from NELSON or R.A.

15. G.H. was an accountant that assisted NELSON in establishing financial accounts and corporate entities and coordinating wires and payments on NELSON's behalf. G.H. assisted NELSON in preparing invoices for A.C. subsidiaries. G.H. replaced H.V. in January 2010. A letter dated January 2010 from Chase Bank revealed that G.H. was replacing H.V. as a signor on the R.A. account at Chase Bank. G.H. managed the R.A. bank account and served as the middleman or paying agent for D.O.

16. ASCORBE was a project manager or construction manager for D.O., which would send money to R.A. and R.A. would then pay ASCORBE. ASCORBE was also working for D.O. at the time and ASCORBE was receiving payments from D.O. through R.A. G.H. was not aware of ASCORBE ever performing work for NELSON or R.A. While NELSON had an office at D.O., he did not report to anyone. D.O. employees did not talk about NELSON, who only spoke to D.O. top management, including ASCORBE.

**B.     Payments to ASCORBE in furtherance of the wire fraud conspiracy**

17.     In December 2009, most of NELSON's income came from an exclusive consulting contract dated July 30, 2009 between ANAHUAC HOLDINGS CORPORATION, S.A.– an entity associated with NELSON – and D.O. A filing, submitted by NELSON to the FDIC related to his purchase of shares in Security State Bank, did not reveal that there were any other companies to which NELSON provided consulting services. The July 2009 contract was signed by NELSON on behalf of CONSTRUCTION ADVICE CIA, S.A. ("CONSTRUCTION ADVICE") and ASCORBE on behalf of D.O.

18.     The July 2009 contract stated that CONSTRUCTION ADVICE was to provide consulting services to D.O. to support D.O. "in its dealings with … or any other government agency involved in the potential submission of complaints, the preparation of the bid, monitoring such until the decision and, if applicable, to the execution of the contract…" D.O. agreed to pay CONSTRUCTION ADVICE $5,391,000 in exchange for these services. The July 2009 contract indicated that D.O. granted ASCORBE, director general of D.O., the power of attorney to enter the contract. In the filing submitted to the FDIC, NELSON provided a chart showing that CONSTRUCTION ADVICE was a subsidiary of ANAHUAC HOLDINGS, which is 100% owned by NELSON The chart also reflected that NELSON was the 100% owner of S.C. and 50% owner of R.A.

19.     In the filing, NELSON referenced an invoice dated October 12, 2009 totaling $5,391,000. The invoice was issued from CONSTRUCTION ADVICE to D.O. and stated "RE: LEGAL AND REGULATORY ADVISORY SERVICES FOR THE ELECTRIC POWER GENERATION PLATFORM INTERNATIONAL TENDER [x]04-09." NELSON did business

development work for D.O. to win contracts, not legal and regulatory advisory services as the invoice indicates. NELSON had no background in engineering. Tender x04-09 was a contract issued to D.O. to provide an offshore gas-fired turbine system. The contract amount awarded was $198 million.

20. R.A.'s Chase Bank account x7465 shows incoming wires from ANAHUAC HOLDINGS, followed quickly by wires in similar amounts from R.A. to ASCORBE Between July 30, 2009 through December 21, 2012, the payments from R.A. to ASCORBE totaled $5,135,485. As part of the fraud, kickback and money laundering scheme, the payments to ASCORBE were made to a Security State Bank account that NELSON helped obtain for ASCORBE. When NELSON began making payments to ASCORBE, NELSON's only known income was from D.O., of which ASCORBE was the chief executive officer. ASCORBE was the same person who authorized the contract on D.O.'s behalf.

      **C.**    **Payments to TRESGALLO in furtherance of the wire fraud conspiracy**

21. TRESGALLO was previously the director general of A.V., a subsidiary of A.C. As part of the fraud, kickback and money laundering scheme, NELSON sent false invoices to A.V. for payment as a way to both effectuate and conceal the fraud/kickbacks. These invoices were addressed to TRESGALLO, who approved the payments to the NELSON-controlled entities. From September 1, 2017 to June 19, 2019, NELSON-controlled entities submitted invoices to A.V. totaling $11,912,362.49. These invoices were addressed to TRESGALLO's attention. In return, NELSON and/or G.H. sent funds back to TRESGALLO, that had been obtained using the false invoices. In some instances, funds sent to TRESGALLO appear to

derive from A.V. after they were directed through multiple accounts controlled by NELSON and/or G.H.

22. On June 25, 2018, R.C. sent a wire of $1,264,048 to H.V., an entity controlled by G.H. The listed purpose of this wire was reimbursement. On June 26, 2018, A.V. sent two wires totaling $2,070,480 to a bank account in Costa Rica titled to R.C., a NELSON-controlled entity. The same day, H.V. sent a wire for $897,532 to TRESGALLO at Post Oak Bank. The listed purpose of the wire was "DB Support – Milestone 2 and 3 of 3 / Complete."

23. In sum, NELSON and G.H. opened a series of U.S. and foreign bank accounts titled in the names of foreign corporate entities to bill A.C., moving the funds through several bank accounts under their control. NELSON and G.H. ultimately used the funds to make payments to TRESGALLO and others in furtherance of the wire fraud conspiracy.

D. **Defendant Account 1 - Stellar Bank Account x4438**

24. On February 25, 2015, NELSON and G.H. opened Defendant Account 1. They were the only signors on the account. Defendant Account 1 was later transferred to Post Oak Bank when Post Oak Bank acquired Security State Bank, and then to Allegiance Bank when Allegiance Bank acquired Post Oak Bank. Allegiance Bank later became Stellar Bank.

25. For Defendant Account 1, between February 25, 2015 – February 20, 2023, 99% of the credits were from other NELSON / G.H. accounts or other ASCORBE accounts which were funded by NELSON. The substantial majority of these funds were proceeds of the kickback scheme and were used to further the wire fraud and money laundering conspiracy.

26. The beginning balance on February 25, 2015 was $0. On February 27, 2015, $100,000 was wired from Defendant Account 1 to ASCORBE's female companion. According

9

to Security State Bank records, Defendant Account 1 was funded on March 2, 2015 through March 4, 2015 with credits totaling $7,895,289.95. The credits consisted of $3,269,350.13 from the redemptions of four certificates of deposit funded primarily with fraud/kickback proceeds at Security State Bank in ASCORBE's name (that were received from NELSON) along with $104,038.16 (1%) from an unknown source. A deposit of $2,014,056.47 came from another account at Security State Bank titled to ASCORBE with the listed purpose of closing out the account. The additional credits consisted of a wire on March 2, 2015 for $860,900.89 from an account at Allegiance Bank titled to ASCORBE, and a wire on March 4, 2015 for $1,750,982.46 from a Morgan Stanley account titled to ASCORBE.

27. On April 3, 2013, ASCORBE established Morgan Stanley account x0324. This account was primarily funded by two wires from NELSON entity bank accounts in Costa Rica.

28. On April 30, 2013, and July 1, 2013, Morgan Stanley account x0324 received $499,980 and $1,499,980 respectively from a Banco National de Costa Rica bank account. The wire details reference an entity associated with NELSON, who also maintained accounts at Morgan Stanley.

29. On March 3, 2015, ASCORBE sent a signed letter to Morgan Stanley requesting that a $1,750,982.46 wire be made to Defendant Account 1. On April 21, 2015, Defendant Account 1 received a wire credit for $99,985 regarding an entity associated with NELSON. On June 1, 2022, Defendant Account 1 had a balance of $6,374,656.92. On June 6, 2022, $2,829,821.51 was wired from Defendant Account 1 to Defendant Account 3.

30. Between April 22, 2015 through February 20, 2023, Defendant Account 1 had total credits of only $93.79. On February 20, 2023, the balance in Defendant Account 1 was $3,544,819.41.

31. In 2019, NELSON had signatory authority on a Costa Rican bank account in the name HOPEN LIMITADA, which had a highest balance for the year of $4,389,580.21. ASCORBE was a direct beneficial owner of this account. NELSON's estate had no interest in Defendant Account 1 or Defendant Account 2.

32. On April 19, 2023, the funds on deposit in Defendant Account 1 were $3,544,819.41. On May 9, 2023, the United States seized $3,544,819.41 in funds from Defendant Account 1.

### E. Defendant Account 2 - Stellar Bank Account x3876

33. On February 3, 2015, NELSON and G.H. opened Defendant Account 2. They were the only signors on the account. Defendant Account 2 was later transferred to Allegiance Bank when it acquired Post Oak Bank. Allegiance Bank later became Stellar Bank.

34. On February 4, 2015, Defendant Account 2 had a beginning balance of $0. From February 4, 2015 through January 25, 2023, the total credits to Defendant Account 2 were $2,341,635.81. After it opened in February 2015, Defendant Account 2 appears to have been primarily used to fund expenses related to ASCORBE. The withdrawals from Defendant Account 2 included ATM withdrawals in Spain and annual expenses regarding the Houston Unit and Miami Unit, including property taxes and homeowners' association dues. In addition, monies were paid to a law firm.

35. For Defendant Account 2, between April 22, 2021 through January 25, 2023, 97% of the credits to Target Account 2 were transfers from Defendant Account 1. As described above, Defendant Account 1 was primarily funded from other NELSON / G.H. related accounts (which were funded by the kickback/fraud conspiracy proceeds) before being used to further the wire fraud and money laundering conspiracies.

36. On April 19, 2023, the funds on deposit in Defendant Account 2 were $3,352.27. On May 9, 2023, the United States seized $3,142.19 in funds from Defendant Account 2.

F. **Defendant Account 3 - The Northern Trust Company Account x5546**

37. On January 5, 2012, NELSON and G.H. opened Allegiance Bank account x4370 ("Allegiance x4370"). They were the only signors on the account. On June 6, 2022, Allegiance x4370 had a beginning balance of $104,005.39. The same day, there was a wire for $2,829,821.51 from Defendant Account 1 to Allegiance x4370. Following the credit on June 6, 2022 of $2,829,821.51, there was a $500,000 wire on June 7, 2022 to NELSON at Northern Trust and check x9040 (postdated June 8, 2022) for $500,000 payable to H.V.

38. On June 8, 2022, Allegiance x4370 had a balance of $1,910,524.59. On January 6, 2023, Allegiance x4370 sent $412,214.39 to Target Account 3. The funds that comprised the $412,214.39 transfer to Target Account 3 were funded by the original credit of $2,829,821.51 to Allegiance x4370. The $2,829,821.51 credit was originally sent from Defendant Account 1 - approximately 99% of the $2,829,821.51 credit was derived from the wire fraud conspiracy. On April 28, 2023, the funds on deposit in Defendant Account 3 were $799,361. On May 9, 2023, the United States seized $412,214.39 in funds from Target Account 3.

G. **Defendant Account 4 - Stellar Bank Account x6763**

39. On December 12, 2016, TRESGALLO opened Allegiance Bank account x1431. On July 3, 2018, NELSON was added as a signor to Allegiance Bank account x1431. On December 12, 2016, the initial deposit to Allegiance Bank account x1431 was a $10,000 check from NELSON. Following the initial $10,000 deposit, the credits to Allegiance Bank account x1431 from December 12, 2016 through June 14, 2019 totaled $5,356,946.53, of which $4,660,660.72 (87%) was from H.V.'s accounts at Allegiance Bank account x7160 and Bank of America account x0744, and $499,980.00 (9%) was from NELSON's entity account(s) in Costa Rica. The other credits included a wire return credit for $149,950 (3%) and minor interest credits.

40. On March 12, 2013, G.H. opened Bank of America account x0744 (BOA X0744) titled to H.V. From June 27, 2017 to December 24, 2018, there were seven wires totaling $1,090,358.99 from BOA x0744 to Allegiance Bank account x1431. A review of BOA x0744 revealed that 99% of the credits to BOA x0744 were from other NELSON / G.H. accounts. Essentially, BOA x0744 served as a pass-through account to move fraud/kickback proceeds from other NELSON / G.H. accounts to TRESGALLO's Allegiance Bank account x1431.

41. On April 27, 2018, G.H. opened Allegiance account x7160 titled to H.V. From April 27, 2018 through June 11, 2019, the credits to Allegiance Bank account x7160 totaled $4,909,909.50, of which $4,634,757.97 (94%) were from NELSON-related foreign entities. Between May 3, 2018 through June 24, 2019, Allegiance Bank account x7160 sent $3,570,301.73 to Allegiance Bank account x1431.

42. BOA x0744 and Allegiance account x7160 operated as pass-through bank accounts to transfer money from NELSON to TRESGALLO: 99% of deposits into Allegiance Bank account x1431 came from bank accounts controlled by NELSON and / or G.H.

43. From approximately September 2017 to approximately June 2019, NELSON controlled companies that submitted invoices to TRESGALLO-led companies. At least $11.9 million of these invoices were marked to the attention of TRESGALLO. From approximately December 2016 to approximately June 2019, NELSON sent approximately $5.1 million to TRESGALLO personal bank accounts at Allegiance Bank that were set up for TRESGALLO; these funds had previously moved through various NELSON and / or G.H. accounts.

44. On March 4, 2020, TRESGALLO opened Defendant Account 4 with an address in Madrid, Spain. TRESGALLO was the only signor on the account. On March 4, 2020, Defendant Account 4 was initially funded with a credit of $157,019.49 which represented the closing proceeds from Allegiance Bank account x1431. Allegiance Bank account x1431 was closed for the purpose of opening a new account and removing NELSON as a signor. Defendant Account 4 was the new account replacing Allegiance Bank account x1431.

45. From March 4, 2020 to May 14, 2021, the credits to Defendant Account 4 totaled $448,621.36, excluding a $1,008,353.43 transfer described below. The credits consisted of $157,019.49 (35%) which represented the closing balance in Allegiance Bank account x1431, and $284,629.65 (63%) from Allegiance account x7160. The other credits totaled $6,972.22 (2%).

46. For Defendant Account 4, between March 4, 2020 through May 14, 2021, 98% of the funds were derived from Allegiance Bank account x1431 and Allegiance account x7160. A

14

review of credits to Allegiance Bank account x1431 and Allegiance account x7160 from December 2016 and April 2018, respectively, revealed that those accounts were primarily funded from other NELSON/G.H. related accounts involved in the wire fraud conspiracy. On April 19, 2023, the funds on deposit in Defendant Account 4 were $79,414.54. On May 9, 2023, the United States seized the funds in Defendant Account 4.

### H.     The Houston and Miami Units

47.    NELSON and G.H. used a series of business entities, a Costa Rican trust, and foreign bank accounts to launder the wire fraud proceeds paid to ASCORBE, some of which were later used to buy the Houston Condominium Unit and the Miami Condominium Unit for the benefit of ASCORBE, utilizing the HOPEN S.A. corporate entity (later HOPEN LIMITADA).

48.    On January 22, 2010, NELSON, as attorney-in-fact for HOPEN S.A., purchased the Houston Unit – a luxury condominium unit – for ASCORBE, but placed the condominium in the name of HOPEN S.A., with a contact address in Costa Rica The contract sales price was $1,340,000.

49.    On December 8, 2009, NELSON had paid the earnest money with a $20,000 personal check. The remaining funds were paid from a wire on January 22, 2010, for $1,326,053 from a HOPEN S.A. bank account in Costa Rica. Despite this, the general manager of the Houston Unit identified ASCORBE as the unit owner. ASCORBE was the only one that has resided in the unit.

50.    The purchase of the Houston Unit was a purchase (i.e., kickback) for the benefit of ASCORBE.

51. On January 26, 2010, the Miami Unit – a second luxury condominium unit – was purchased for ASCORBE. The unit was also purchased in the name of HOPEN S.A., a Costa Rican entity, at an address in Costa Rica. The contract sales price was $1,500,000. $100,000 was paid in earnest money and $1,406,515.60 was due at closing. The settlement statement was signed and dated January 26, 2010 by a person identified as the authorized representative of F.M. as President of HOPEN S.A.

52. F.M. was an accountant based in Mexico. He was affiliated with NELSON. F.M. was listed on a corporate resolution as the president of HOPEN S.A. in order to effectuate the purchase of the Miami Unit.

53. On January 11, 2010, F.M. traveled from Mexico to Houston and returned to Mexico the next day. On January 26, 2010, F.M. traveled to Miami from Mexico and returned to Mexico the following day.

54. Although HOPEN S.A. was listed as the owner of the Miami Unit (with a Costa Rican law firm's mailing address), a Confidential Owner/Resident Information/Emergency Contacts form submitted to the property management company for the unit contained NELSON's contact telephone numbers and email address. The primary resident was listed as ASCORBE; the emergency contact was NELSON. Additional occupants were listed as ASCORBE's wife and family members along with ASCORBE's female companion. ASCORBE planned to paint / remodel and furnish the Miami Unit. ASCORBE authorized workers to make a copy of the lower lock key for unit access. A trust in the Cayman Islands owned HOPEN LIMITADA; ASCORBE was the trust's beneficiary.

55. The purchase of the Miami Unit was a purchase (i.e., kickback) for the benefit of ASCORBE.

56. The Houston Unit and the Miami Unit belonged to ASCORBE. NELSON did not use the Miami Unit on a routine basis but may have used the Houston Unit on one occasion. At various times, NELSON managed the condominium units for ASCORBE.

57. HOPEN S.A. was established in Costa Rica in 2006. In March 2010, HOPEN S.A. changed its name to HOPEN LIMITADA In 2008, all the shares of HOPEN S.A. were transferred to ANAHUAC HOLDINGS, of which NELSON was listed as 100% owner. On January 10, 2010, all the HOPEN S.A. shares were transferred to UPTOWN CONSTRUCTION HOLDINGS, INC. ("UPTOWN CONSTRUCTION"). ASCORBE was the beneficial owner of UPTOWN CONSTRUCTION.

58. Defendant Account 2 was opened in February 2015. Thereafter, it was primarily used to fund expenses related to ASCORBE and pay annual homeowners association dues and property taxes for the Houston Unit and the Miami Unit. From 2015 until 2022, Defendant Account 2 paid approximately $542,352.84 in expenses for the Houston Unit, and approximately $355,460.09 in expenses for the Miami Unit. As described above, those funds constitute proceeds of the fraud/kickback scheme and property involved in money laundering.

59. On October 7, 2015, ASCORBE transferred all the UPTOWN CONSTRUCTION shares to S.L. On December 15, 2015, NELSON transferred back to ASCORBE all the shares of UPTOWN CONSTRUCTION On November 10, 2017, all the HOPEN LIMITADA shares were transferred to B.T., of which ASCORBE was listed as the first settlor (maker of the trust) and NELSON was the sole enforcer. G.H. signed as a witness. NELSON was the sole manager

holding a power of attorney for HOPEN LIMITADA since January 27, 2010, the day after NELSON's associate purchased the Miami Unit.

60. Ultimately, NELSON formed several Costa Rican entities using the name of HOPEN LIMITADA to disguise payments and the purchase of assets for ASCORBE's benefit utilizing fraud and kickback proceeds. NELSON distanced himself from the payments to ASCORBE and the purchases of assets for ASCORBE. These acts of distancing were in furtherance of the wire fraud and money laundering conspiracies and took the form of foreign companies and trusts (*e.g.*, HOPEN LIMITADA, HOPEN S.A., ANAHUAC HOLDINGS, UPTOWN CONSTRUCTION, S.L., and B.T.).

## CONCLUSION

61. The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

## NOTICE TO ANY POTENTIAL CLAIMANT

The United States will serve notice, along with a copy of the Complaint, on the property owner(s) and on persons who reasonably appear to be potential claimants.

YOU ARE HEREBY NOTIFIED if you assert an interest in the property subject to forfeiture and want to contest the forfeiture, you must file a verified claim which fulfills the requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. The verified claim must be filed no later than 35 days from the date this complaint was sent to you in accordance with Rule G(4)(b); or, if this Complaint was not sent to you, no later than 60 days after the first day of publication of notice on an official internet government forfeiture site, in accordance with Rule G(5)(a)(ii)(B).

18

An answer or a motion under Federal Rule of Civil Procedure 12 must be filed no later than 21 days after filing the claim. The claim and answer must be filed with the United States District Clerk for the Southern District of Texas, and a copy must be served upon the undersigned Assistant United States Attorney at the address provided in this Complaint.

### RELIEF REQUESTED

The United States seeks a final judgment forfeiting the Defendant Properties to the United States and requests any other relief to which the United States may be entitled.

Respectfully submitted,
ALAMDAR S. HAMDANI
United States Attorney

*s/Brandon L. Fyffe*
Brandon L. Fyffe
SDTX Federal No. 3698129
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone (713) 567-9000
Fax: (713) 718-3300


MARGARET A. MOESER
Acting Chief
Money Laundering and Asset Recovery Section

*/s/ Sinan Kalayoglu*
Sinan Kalayoglu
Trial Attorney
Money Laundering and Asset Recovery Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005
(202) 514-1263
sinan.kalayoglu2@usdoj.gov

## Verification

I, Coy E. Davis, a Special Agent with the Federal Bureau of Investigation, hereby verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the facts set forth in the foregoing Verified Complaint For Forfeiture In Rem are based upon either personal knowledge or from information, reports, or records obtained during investigation and from other law enforcement personnel, and are true and correct to the best of my knowledge and belief.

Executed on August 18, 2023.

_____
Coy E. Davis
Special Agent
Federal Bureau of Investigation